IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

Mary D. Pinkney,                          )
                                          )      Civil Action No. 6:15-2226-BHH-KFM
                    Plaintiff,            )
                                          )      **REPORT OF MAGISTRATE JUDGE**
          vs.                             )
                                          )
Carolyn W. Colvin, Acting                 )
Commissioner of Social Security,          )
                                          )
                    Defendant.            )
_____ )

        This case is before the court for a report and recommendation pursuant to

Local Civil Rule 73.02(B)(2)(a) (D.S.C.), concerning the disposition of Social Security cases

in this District, and Title 28, United States Code, Section 636(b)(1)(B).

        The plaintiff brought this action pursuant to Section 205(g) of the Social

Security Act, as amended (42 U.S.C. 405(g)) to obtain judicial review of a final decision of

the Commissioner of Social Security denying her claim for disability insurance benefits

under Title II of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

        The plaintiff filed an application for disability insurance benefits ("DIB") on

June 9, 2011, alleging that she became unable to work on May 8, 2011.  The application

was denied initially and on reconsideration by the Social Security Administration.  On March

23, 2012, the plaintiff requested a hearing.  The administrative law judge ("ALJ"), before

whom the plaintiff and William W. Stewart, Ph.D., an impartial vocational expert, appeared

on August 2, 2013, considered the case *de novo* and, on January 30, 2014, found that the

plaintiff was not under a disability as defined in the Social Security Act, as amended.  The

ALJ's finding became the final decision of the Commissioner of Social Security when the

Appeals Council denied the plaintiff's request for review on May 14, 2015. The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

(1)  The claimant meets the insured status requirements of the Social Security Act through December 31, 2016.

(2)  The claimant has not engaged in substantial gainful activity since May 8, 2011, the alleged onset date (20 C.F.R. § 404.1571 *et seq*).

(3)  The claimant has the following severe impairments:  panic disorder with agoraphobia, major depressive disorder, obsessive-compulsive disorder, and post-traumatic stress disorder (PTSD) (20 C.F.R. § 404.1520(c)).

(4)  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526).

(5)  After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a range of work at all exertional levels but with the following nonexertional limitations:  due to her mental impairments, she is restricted to unskilled work requiring no interaction with the public and no team-type interaction with co-workers.

(6)  The claimant is unable to perform any past relevant work (20 C.F.R. § 404.1565).

(7)  The claimant was born on February 21, 1956, and was 55 years old, which is defined as an individual of advanced age, on the alleged disability onset date (20 C.F.R. § 404.1563).

(8)  The claimant has a a high school education and is able to communicate in English (20 C.F.R. § 404.1564).

(9)  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not claimant has

2

transferable job skills (*See* SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

(10) Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that claimant can perform (20 C.F.R. §§ 404.1569 and 404.1569(a)).

(11) The claimant has not been under a disability, as defined in the Social Security Act, from May 8, 2011, through the date of the decision (20 C.F.R. § 404.1520(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing

3

substantial gainful employment.   20 C.F.R. § 404.1520.   If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* § 404.1520(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3.   The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).   He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy.   The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy that the plaintiff can perform despite the existence of impairments that prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).   Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. See *Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)).   The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

4

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4ᵗʰ Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational.  *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4ᵗʰ Cir. 1964).  If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4ᵗʰ Cir. 1972).

## EVIDENCE PRESENTED

The plaintiff was 55 years old on her alleged disability onset date (May 8, 2011) and 57 years old on the date of the ALJ's decision (January 30, 2014).  She has a high school education and past relevant work as a machine operator at Beckton Dickinson and Company, where she worked for 35 years (Tr. 25, 35).

On December 28, 2010, while she was still working, the plaintiff sought treatment for vague chest pain and hypertension.  Her blood pressure initially was 169/88, but on repeat measurement without treatment was 130/76.  Her cardiac enzymes and EKG were normal.  Her chest x-ray showed that her lungs were well expanded and clear, and her heart and chest bones were unremarkable with no active disease. On physical examination, Joseph A. Campbell, M.D., observed that the plaintiff moved all extremities freely with no obvious bony or joint abnormalities (Tr. 255-57).

On February 3, 2011, the plaintiff presented to the emergency room complaining of difficulty swallowing and stated that her symptoms were worse after she took Micardis, a blood pressure medication.  She denied difficulty breathing, chest pain, or shortness of breath.  Her lungs were clear, and she had no obstruction of the airways. X-rays of her neck showed no soft tissue swelling.  An MRI revealed "Suspect at least moderate degenerative disc disease at C5-C6." She was encouraged to keep a scheduled appointment with George A. Jenkins, M.D., a gastroenterologist.  She returned ten days

5

later with similar complaints. A barium swallow was essentially unremarkable for any obstruction. She was advised to decrease Xanax from three times a day to twice a day (Tr. 258-69).

On February 9, 2011, the plaintiff established care as a new patient at Midlands Internal Medicine. Nitkin Patel, M.D., noted that the plaintiff reported that she had fluctuations in hypertension, but her cardiac workup, chest-x-ray, and cardiac enzymes were negative. The plaintiff complained that Micardis caused worsening dysphagia and reflux symptoms. Dr. Patel reported that the plaintiff was not currently experiencing pain and did not experience chronic pain. On examination, the plaintiff's range of motion and strength were normal in all extremities. Her mental status was intact for judgment and insight, and her memory was intact for recent and remote events. Dr. Patel gave the plaintiff samples of Xanax for anxiety (Tr. 310-14).

On February 18, 2011, Dr. Jenkins noted that recent upper endoscopies revealed no tight stricture (Tr. 267, 295-96). He performed an esophageal manometry that demonstrated no esophageal motility disorder (Tr. 257, 291-92). Dr. Jenkins recommended considering "globus hystericus" since he could not find an anatomical or physiological explanation for globus sensation and dysphagia (Tr. 268). When the plaintiff returned to Dr. Jenkins on April 13, 2011, for follow-up, he noted no recurrent dysphasia (Tr. 280). On examination, Dr. Jenkins found that the plaintiff's chest was clear, her heart sounds were normal, and she had no swelling or edema of her extremities (Tr. 281). He indicated that her globus sensation and dysphasia had resolved (Tr. 282).

On May 4, 2011, Dr. Patel noted that the plaintiff complained of experiencing shortness of breath at the same time every day around 11:00 a.m., while at work. The plaintiff reported that she was planning to retire in December 2011. She also indicated that her anxiety had been better after starting Xanax. Dr. Patel reported that the plaintiff's shortness of breath had now resolved. He added Lexapro and recommended that she

6

continue Xanax as needed.  Dr. Patel noted that the plaintiff was not compliant with her medication for hypertension (Tr. 302-04).

Beginning on May 16, 2011, the plaintiff spent ten days at the Three Rivers Center for Behavioral Health in West Columbia in a partial hospitalization program where she was treated for issues related to depression and anxiety (Tr. 322, 350).  She spent her days at Three Rivers attending therapy sessions and her nights at home with her family (Tr. 391).  The therapy notes indicate that the plaintiff's father was an alcoholic who abused all members of the family and that she was concerned that her own son was drinking too much, which triggered her symptoms of post-traumatic stress disorder ("PTSD") (Tr. 375). The plaintiff complained of difficulty breathing between 11:00 a.m. and 2:00 p.m., and a loud bell at work that made her nervous (Tr. 331).  The plaintiff stated in a group discussion that her reason for admission was a developing dependence upon Xanax and that her goal was to take Xanax only once or twice a day (Tr. 372).  While at Three Rivers, the plaintiff participated in educational sessions about stress management, the positive effect of exercise, mindfulness meditation, medication compliance, rational thinking, and essentials for relationship success (Tr. 373-74, 379. 392, 398, 403).  She completed a one-mile walk without any difficulty (Tr. 374).

Cheryl Dodds, M.D., who managed the plaintiff's treatment at Three Rivers, noted that Zoloft helped the plaintiff with her anxiety and that she was sleeping better (Tr. 363).  On May 25, 2011, the plaintiff reported to Dr. Dodds that her medications were working better and that Celexa helped her sleep better; she had weaned herself off Xanax, and her anxiety was better.  Dr. Dodds noted that the plaintiff's judgment was good and her attention and concentration was intact (Tr. 369).

On mental status examination, the plaintiff was able to recall three of three objects after five minutes.  Her overall memory assessment was good.  On a test of concentration, she was able to spell "world" forwards and backwards; her overall

7

concentration assessment was "good" (Tr. 351-52).  The discharge summary on May 27, 2011, indicated that the plaintiff's prognosis was good as long as she talked openly about her symptomology, took her medication as prescribed, and attended outpatient appointments (Tr. 322).  Her Global Assessment of Functioning ("GAF") score on discharge was 65 (Tr. 322).[1]  Dr. Dodds observed that the plaintiff's affect was bright, her mood good, her thoughts linear and goal-directed, and her insight and judgment were improved (Tr. 354).  Dr. Dobbs referred the plaintiff to Linda Zaepfel, A.P.R.N., B.C., L.I.S.W.-C.P., a nurse practitioner ("NP") at Barnabus Health Care, for medication management and therapy (Tr. 328).

The plaintiff saw NP Zaepfel initially on June 14, 2011.  NP Zaepfel noted that the plaintiff had been treated by Dr. Patel for anxiety with Xanax, Lexapro, and Celexa, but was weaned her off Xanax when she started Celexa, but that she still continued to experience some anxiety (Tr. 457).  NP Zaepfel noted that the plaintiff's behavior was appropriate, her attention and concentration was focused; she had a full range of affect; her memory was intact for short and long term; her thought content and process was goal-directed; and her judgment and insight were excellent.  NP Zaepfel diagnosed panic disorder with agoraphobia, major depressive disorder ("MDD"), and obsessive compulsive

_____

[1]A GAF score is a number between 1 and 100 that measures "the clinician's judgment of the individual's overall level of functioning." *See* Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders*, 32-34 (Text Revision 4th ed. 2000) ("*DSM-IV*"). A GAF score between 71 and 80 indicates that, if symptoms are present, they are transient and expectable reactions to psychosocial stressors, and there is no more than slight impairment in any area of psychological functioning. A GAF score between 61 and 70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well. *Id.* A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *Id.* A GAF score between 41 and 50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning.  *Id.* The court notes that the fifth edition of the DSM, published in 2013, has discontinued use of the GAF for several reasons, including "its conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice." *See* Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders*, 16 (5th ed. 2013) ("*DSM–V*").

disorder ("OCD"), and assessed a GAF of 55, indicating moderate symptoms (Tr. 458).  On a questionnaire, the plaintiff indicated that the coping skills that she learned at Three Rivers helped her anxiety disorder (Tr. 461).  NP Zaepfel continued to see the plaintiff on a monthly basis for medication management.

On July 21, 2011, Dr. Patel noted that the plaintiff had a good experience at Three Rivers and felt better.  She was currently taking Cymbalta and seeing a psychologist. She was also taking Benicar HCT for hypertension, Clarinex, and Xanax twice a day.  The plaintiff denied back pain, joint pain, joint swelling, muscle cramps, weakness, and stiffness. Her judgment and insight were intact. Dr. Patel substituted non-generic Xanax for generic Xanax because the plaintiff felt that generic Xanax did not work and necessitated her attendance at Three Rivers (Tr. 451-53).

On August 16, 2011, NP Zaepfel decreased the plaintiff's Cymbalta, prescribed Abilify, and assessed a GAF of 60 (Tr. 463).

On October 3, 2011, Dr. Patel noted that the plaintiff was seeing a psychologist for anxiety and had recently started on Luvox, but reported no improvement in two weeks.  She was also taking Clarinex and Xanax.  On examination, her range of motion and strength in her upper and lower extremities was normal, with no joint enlargement or tenderness (Tr. 446-48). Dr. Patel referred the plaintiff for a CT scan of her chest that showed a largely resolved nodule, a small and stable nodule unchanged in size, and no evidence of active disease (Tr. 509).

On October 11, 2011, NP Zaepfel noted that the plaintiff was working with children as a volunteer two days a week (Tr. 468).  She increased the plaintiff's Luvox and referred the plaintiff to her husband, Gary Zaepfel, Ph.D., a psychologist (Tr. 469).  On January 24, 2012, NP Zaepfel noted that the plaintiff had been doing well (Tr. 538).  Her GAF was 65, indicating only mild symptoms (Tr. 539).  On February 7, 2012, NP Zaepfel noted that the plaintiff was not taking Zanax in the morning, but only at night, and was not

9

feeling as anxious (Tr. 536).  NP Zaepfel assessed a GAF of 70, indicating only mild symptoms (Tr. 537).

On February 29, 2012, NP Zaepfel prepared a psychosocial assessment in which she summarized the plaintiff's childhood experience, employment, and health history. The assessment noted that the plaintiff enjoyed helping with children and assisted occasionally with an after school program at her church and that the plaintiff usually attended church every Sunday and enjoyed singing in the choir (Tr. 527-33).

On March 6, 2012, NP Zaepfel assessed a GAF of 70 (Tr. 535) and noted that plaintiff was still trying to volunteer when able (Tr. 534).

On March 9, 2012, at the referral of Dr. Patel, Nicholas A. Lind, Psy.D., evaluated the plaintiff's psychological impairments, performed some tests, and concluded that she met the Listing 12.06, due to "recurrent severe panic attacks that are reduced in duration but not frequency or intensity with the use of an anxiolytic" (Tr. 476). *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06 (Anxiety Related Disorders). Specifically, the plaintiff underwent the following tests:  1)  The Minnesota Multiphasic Personality Inventory ("MMPI") test.; 2)  the Detailed Assessment of Posttraumatic Stress test.; 3) the Beck Depressive Inventory test.; 4) the Beck Anxiety Inventory test.; and 5) the Brief Test of Attention.  The results of the MMPI examination were found to be valid, and Dr. Lind noted that persons with the similar profiles to the plaintiff's "have been found to experience significant impairment in occupational and interpersonal functioning."  On the Beck Depressive Inventory test, the plaintiff reported experiencing  severe levels of depression, while on the Beck Anxiety Inventory, the plaintiff reported experiencing severe levels of anxiety.  The plaintiff tested in the impaired range on the Brief Test of Attention. The Detailed Assessment of Posttraumatic Stress test provided a "valid representation of her current status." Based on his examination and testing, Dr. Lind found that the plaintiff's GAF was 49, indicating severe symptoms, and concluded that her panic attacks resulted in

"marked impairment in concentration, social functioning and occupational ability." Dr. Lind noted that the plaintiff reported significant emotional distress at the time of a traumatic event (the most significant being the episode in which her drunken father allegedly shot at her sister) and opined that exposure to repeated traumas can make an individual more vulnerable to posttraumatic stress symptoms and that PTSD places the plaintiff at risk for panic attacks and for anxiety in general.  Dr. Lind acknowledged that the plaintiff was able to manage her symptoms while working for 35 years but opined that her symptoms progressed to the point of impairment in May 2011 (Tr. 473-76).

During a routine follow-up on April 9, 2012, Dr. Patel noted that the plaintiff complained of chest pain, but that her EKG was normal (Tr. 505).  Dr. Patel referred the plaintiff for a nuclear stress test that was negative for ischemia and showed a normal ejection fraction (Tr. 499).  Dr. Patel's physical examination was normal (Tr. 504).  Her blood pressure was 136/82 (Tr. 503).  Her judgment and insight were intact (Tr. 505).

On May 1, 2012, the plaintiff reported to NP Zaepfel that she was feeling very sad since her brother died (Tr. 525).  Her GAF was 75, indicating only transient symptoms (Tr. 526).

On June 11, 2012, the plaintiff again reported that she had been sad since her brother died (Tr. 523).  NP Zaepfel continued the plaintiff on BuSpar, Paxil, and Luvox, and assessed a GAF of 65, indicating mild symptoms (Tr. 525).  On July 9, 2012, NP Zaepfel observed that the plaintiff's mood was "good" (Tr. 521).  NP Zaepfel assessed a GAF of 70, indicating mild symptoms (Tr. 522).

On October 10, 2012, NP Zaepfel noted that the plaintiff's mood was "OK," but that she sometimes felt depressed about money and finances.  Her speech was clear; her thought process logical and goal-directed; her thought content was normal.  Her GAF was 70, indicating only mild symptoms.  NP Zaepfel asked the plaintiff to return in 3-4 months (Tr. 519-20).

An MRI of the lumbar spine dated November 6, 2012, showed "Multilevel disc space narrowing and osteophyte formation." The finding was "no acute abnormality" and mild "multilevel spondylotic changes" (Tr. 492).

On November 8, 2012, Dr. Patel found that the plaintiff's examination was negative, except for anxiety (Tr. 493-96). Dr. Patel noted that the plaintiff's hypertension was stable on Benicar (Tr. 497). Dr. Patel observed that the plaintiff was cooperative, demonstrated an appropriate mood and affect, and normal judgment (Tr. 496).

On December 11, 2012, NP Zaepfel increased Luvox and maintained the plaintiff on Paxil and Buspar (Tr. 517). NP Zaepfel observed that the plaintiff had a full range of affect, her speech was clear and coherent, her thought process was logical and goal-directed, and she had no abnormal thought content (Tr. 516). NP Zaepfel assigned a GAF of 65, indicating only mild symptoms (Tr. 517).

On January 9, 2013, NP Zaepfel noted that the plaintiff went to Philadelphia to attend a funeral, but smelled natural gas, which triggered panic symptoms (Tr. 514). NP Zaepfel assessed a GAF of 55, indicating moderate symptoms (Tr. 515). On January 25, 2013, NP Zaepfel adjusted the plaintiff's medication by prescribing Buspar and decreasing Paxil and Luvox (Tr. 414). NP Zaepfel completed a questionnaire at the request of the plaintiff's attorney on which she indicated that the plaintiff had a fair ability to complete simple job instructions, follow work rules, and relate to co-workers; a good ability to maintain personal appearance; poor ability to follow detailed job instructions and use judgment; and no ability to deal with the public, interact with supervisors, deal with work stresses, function independently, maintain attention and concentration, follow complex job instructions, behave in an emotionally stable matter, relate predictably in social situations, or demonstrate reliability due to her anxiety (Tr. 486-90).

On April 15, 2013, Dr. Patel noted that the plaintiff would have to switch to Micardia medication for blood pressure control due to changes in insurance coverage (Tr.

12

558).  Dr. Patel ordered Clarinex and Atorvastatin for control of cholesterol (Tr. 554).  Dr. Patel continued BuSpar, Luvox, and Paxil (*id*.).

On May 1, 2013, Dr. Patel noted that the plaintiff's blood pressure reading was 132/94 (Tr. 550).  Due to insurance coverage issues, Dr. Patel changed the plaintiff's medication for hypertension control from Benicar to Diovan (Tr. 548).  The plaintiff's speech was clear and coherent, and she demonstrated an appropriate mood and affect, and normal judgment (Tr. 551).  Dr. Patel recommended that the plaintiff continue to follow up with the psychologist for anxiety (Tr. 551).

On July 29, 2013, Dr. Glen Zaepfel prepared a report at the plaintiff's request and noted that he adopted Dr. Lind's diagnoses of PTSD and panic disorder without agoraphobia, but would change that to panic disorder with agoraphobia and add additional diagnoses of: major depressive disorder, single episode, mild; OCD; and anxiety disorder, not otherwise specified .  Dr. Zaepfel stated that "as a result, various psychological triggers will start her inner reaction leading to full blown panic attacks-PTSD with a host of psychophysiological responses rendering her totally disabled and non-functional."   Dr. Zaepfel recommended that the plaintiff continue with treatment for PTSD stemming from gross childhood abuse by an alcoholic father.   He noted that the plaintiff's current medications included BuSpar, Luvox, and Atarax (Tr. 574).

On September 10, 2013, John V. Custer, M.D., a psychiatrist, examined the plaintiff after her hearing at the request of the ALJ (Tr. 580).  The plaintiff told Dr. Custer that she had been married for 37 years to her husband, a truck driver who is frequently away from home.  Dr. Custer noted that the plaintiff lived with one of her daughters and two grandsons.  The plaintiff told Dr. Custer that she receives a retirement income from her previous factory job of $870 a month after insurance is deducted (Tr. 582).  On mental status examination, Dr. Custer found that the plaintiff's speech was normal, her thought process was logical and goal-directed, and that she denied any suicidal or homicidal

ideation.  On the cognitive examination, the plaintiff was fully alert and fully oriented.  She was able to perform serial subtraction, and she was able to follow a three-stage command. Dr. Custer indicated that the plaintiff's intelligence was within the average range (Tr. 582-83).  Dr. Custer diagnosed panic disorder with agoraphobia, possible OCD, and a past diagnosis of PTSD.  Dr. Custer noted that he had reviewed a recent letter by psychologist Glen Zaepfel, which summarized her diagnosis and treatment, but that it was unclear why the plaintiff continued to be symptomatic despite treatment and whether she was exaggerating her symptoms (for instance, claiming to have two to three panic attacks every day despite psychiatric treatment), whether she had been compliant with her treatment, and whether there was some type of secondary gain that was promoting her illness behavior. Dr. Custer questioned why the plaintiff was able to work for 35 years and then suddenly developed panic attacks despite being removed from the only precipitant that she could identify, which was the buzzer at work.  Dr. Custer concluded that it was likely that her functional status was somewhat better than what she was professing.  Dr. Custer suggested that the plaintiff might benefit from Vocational Rehabilitation or some type of job coaching (Tr. 583-84).

Dr. Custer completed a Medical Source Statement in which he indicated that the plaintiff had no limitation in the ability to understand, remember, and carry out simple instructions and a moderate limitation in complex instructions due to the fact that she may have some mild short-term memory deficits based on recalling one out of three objects after five minutes (Tr. 577). Dr. Custer noted that the plaintiff had a moderate limitation in the ability to interact appropriately with the public due to anxiety when in crowds and around strangers, but no limitation on interacting appropriately with supervisors or co-workers.  Dr. Custer observed that the plaintiff had a moderate limitation in the ability to respond appropriately to changes in a routine work setting based on her alleged difficulty adjusting

to a new alarm that was installed at work, but that there was no evidence of impairment in other areas (Tr. 578).

As a result of Dr. Custer's report, the plaintiff's attorney provided interrogatory questions to Dr. Custer and submitted the results to the ALJ prior to her decision (Tr. 236-40). Dr. Custer responded that he did not have access to any diagnostic testing or the plaintiff's medical records except for one letter from Dr. Zaepfel. He also stated that having these records would have been "beneficial in giving me a better understanding of her diagnosis and treatment of her psychological problems." Finally, Dr. Custer agreed that having a copy of the plaintiff's past medical records would have been "beneficial in understanding why [the plaintiff] was continuing to have difficulties" (Tr. 239). Dr. Custer continued to stand by his report and the conclusions as stated in his medical source statement (Tr. 240).

The plaintiff testified at the hearing that she attempted volunteer work for two months after leaving her job but had to stop due to her psychological impairments. The plaintiff further testified that she occasionally does light household chores but that her husband and daughter do most of the shopping (Tr. 38). The plaintiff stated that she can only prepare small meals because she can only stand 10-15 minutes and has to take frequent breaks due to back pain (Tr. 40-42). The plaintiff stated she was forced to retire from her job due to absenteeism caused by her panic attacks. She testified to experiencing breathing problems and panic attacks when the buzzer went off at work (Tr. 43). The plaintiff's anxiety condition drastically worsened over time causing her to be hospitalized at Three Rivers hospital (Tr. 44). The plaintiff testified that she currently has two to three panic attacks a day, which cause her hands to shake, her heart to race, and to experience a choking feeling (Tr. 45).

The ALJ asked the vocational expert whether work existed in the national economy for an individual of the plaintiff's age, education, and work experience, who,

because of her mental impairments, was limited to unskilled work and no working with the public and no teamwork with co-workers (Tr. 51-52). The vocational expert testified that the hypothetical individual could not return to her former work because it was semi-skilled, but could perform other work listed in the *Dictionary of Occupational Titles* ("*DOT*") such as the unskilled jobs of warehouse worker, DOT 922.687-058 (150,000 jobs in the national economy), and packer, DOT 920.587-081 (over 125,000 jobs in the national economy) (Tr. 51).

## ANALYSIS

The plaintiff argues that the ALJ erred by (1) failing to find her degenerative neck and back condition was a severe impairment; (2) failing to give controlling weight to the opinions of Dr. Lind, NP Zaepfel, and Dr. Zaepfel; (3) relying primarily on the opinion of consultative examiner Dr. Custer; and (4) concluding that she could work at all exertional levels (doc. 11 at 9-16).

### Severe Impairment

The plaintiff argues that the ALJ erred in failing to find that her degenerative cervical and lumbar spine was a severe impairment (doc. 11 at 15; doc. 19 at 6).[2] A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). Pursuant to Social Security Ruling ("SSR") 96-03p, "[A]n impairment(s) that is 'not severe' must be a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities." 1996 WL 374181, at *1. Here, at step two of the sequential evaluation process, the ALJ considered the plaintiff's alleged back pain and her testimony that she must lie down twice a day for 30 minutes. However, the ALJ found that the plaintiff's back pain was not severe, noting that the medical record showed no more than mild findings on

---

[2]In her reply brief, the plaintiff incorrectly argues that the Commissioner failed to address this allegation (doc. 19 at 6; *see* doc. 18 at 15).

diagnostic studies and essentially no treatment for such complaints (doc. 17). The MRI evidence showed only "suspect" moderate degenerative disc disease at the cervical level at C5-6 and no acute abnormality of the lumbar spine with mild multilevel spondylotic changes (Tr. 263, 492). T

Furthermore, if an ALJ commits error at step two, it is rendered harmless if "the ALJ considers all impairments, whether severe or not, at later steps." *Robinson v. Colvin*, No. 4:13-cv-823-DCN, 2014 WL 4954709, at *14 (D.S.C. Sept. 29, 2014) (citing *Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008)). *See Washington v. Astrue*, 698 F. Supp. 2d 562, 580 (D.S.C. 2010) (holding that there is "no reversible error where the ALJ does not find an impairment severe at step two provided that he or she considers that impairment in subsequent steps"). Here, the ALJ also considered the plaintiff's complaints of back pain in the residual functional capacity ("RFC") assessment. Specifically, the ALJ again noted that the plaintiff alleged that her back pain required that she lie down twice a day for 30 minutes (Tr. 23). The ALJ noted that the medical record and the plaintiff's activities of daily living, which included cooking, performing household chairs, attending church, shopping, and driving, did not support her allegations of disabling back pain (Tr. 24). Moreover, the State agency medical consultants found that the plaintiff had no severe physical impairments, and the ALJ gave these opinions great weight (Tr. 25; *see* Tr. 61-62, 76-77). The ALJ was required to consider the state agency physician assessments as opinion evidence. *See* 20 C.F.R. § 404.1527(e)(2)(i) ("State agency medical and psychological consultants . . . are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation. Therefore, administrative law judges must consider findings and other opinions of State agency medical and psychological consultants . . . as opinion evidence, except for the ultimate determination about whether you are disabled."). *See* SSR 96-6p, 1996 WL 374180, at *3 ("In appropriate circumstances, opinions from State agency medical . . . consultants . . .

17

may be entitled to greater weight than the opinions of treating or examining sources.");
*Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir.1984) ("[T]he testimony of a
non-examining, non-treating physician should be discounted and is not substantial evidence
when totally contradicted by other evidence in the record. . . . [W]e have also ruled that the
testimony of a non-examining physician can be relied upon when it is consistent with the
record.") (citations omitted).

    Based upon the foregoing, the undersigned finds that the ALJ's step two
finding was based upon substantial evidence and without legal error.

### Medical Opinions

    The plaintiff next argues that the ALJ erred in failing to give controlling weight
to the opinions of Dr. Lind, NP Zaepfel, and Dr. Zaepfel (doc. 11 at 9-13). The regulations
require that all medical opinions in a case be considered, 20 C.F.R. § 404.1527(b), and,
unless a treating source's opinion is given controlling weight, weighed according to the
following non-exclusive list: (1) the examining relationship; (2) the length of the treatment
relationship and the frequency of the examinations; (3)  the nature and extent of the
treatment relationship; (4)  the evidence with which the physician supports his opinion; (5)
the consistency of the opinion; and (6)  whether the physician is a specialist in the area in
which he is rendering an opinion. *Id.* § 404.1527(c)(1)-(5). *See also Johnson v. Barnhart*,
434 F.3d 650, 654 (4th Cir. 2005).  However, statements that a patient is "disabled" or
"unable to work" or similar assertions are not medical opinions.  These are administrative
findings reserved for the Commissioner's determination. SSR 96-5p, 1996 WL 374183, at
*5.

    The opinion of a treating physician is entitled to controlling weight if it is well-
supported by medically acceptable clinical and laboratory diagnostic techniques and is not
inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. §
404.1527(c)(2); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001).  Social Security Ruling

("SSR") 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. 1996 WL 374188, at *5. As stated in SSR 96-2p:

> [A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. §§ 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* at *4.

### *Dr. Lind*

Psychologist Dr. Lind performed an examination of the plaintiff in March 2012 on the referral of Dr. Patel (Tr. 473-76). With regard to the MMPI, Dr. Lind noted that persons with similar profiles to the plaintiff's "have been found to experience significant impairment in occupational and interpersonal functioning." On the Beck Depressive Inventory test, the plaintiff reported experiencing severe levels of depression, while on the Beck Anxiety Inventory, the plaintiff reported experiencing severe levels of anxiety. The plaintiff tested in the impaired range on the Brief Test of Attention (Tr. 475-76). Based on his examination and testing, Dr. Lind found that the plaintiff's GAF was 49, indicating severe symptoms, and concluded that her panic attacks resulted in "marked impairment in concentration, social functioning and occupational ability." Dr. Lind acknowledged that the plaintiff was able to manage her symptoms while working for 35 years but opined that her symptoms progressed to the point of impairment in May 2011. Dr. Lind concluded that the plaintiff met Listing 12.06, due to "recurrent severe panic attacks that are reduced in duration but not frequency or intensity with the use of an anxiolytic" (Tr. 476). *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06 (Anxiety Related Disorders).

To the extent the plaintiff contends the ALJ erred in failing to find that her impairments meet Listing 12.06 based on Dr. Lind's opinion,[3] such argument is without merit. The ALJ did not accept Dr. Lind's opinion that the plaintiff met the criteria for Listing 12.06 (Anxiety Related Disorders) because of recurrent severe panic attacks (Tr. 18-19; *see* Tr. 476). Although recurrent severe panic attacks are listed in the paragraph A criteria of Listing 12.06, a claimant must meet the paragraph A (medical) criteria along with either the paragraph B criteria (marked functional limitations) or paragraph C criteria (complete inability to function independently outside one's home). *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06. The ALJ noted that Dr. Lind's clinical findings from his one-time examination did not describe limitations of function of such severity as required to meet the listing (Tr. 19). Moreover, the ALJ gave great weight to the opinions of the State agency reviewing psychologists who found that the plaintiff did not meet Listings 12.04 (Affective Disorders) or 12.06, further contradicting Dr. Lind's opinion (Tr. 25; *see* Tr. 63-64, 77-78).

The ALJ's finding that the plaintiff's impairments do not meet Listing 12.06 is supported by substantial evidence. The paragraph B criteria requires a "marked" impairment in two of the three areas of functioning (activities of daily living, social functioning, and concentration, persistence or pace), or repeated episodes of decompensation, each of extended duration. The ALJ found that the plaintiff had only moderate restrictions in activities of daily living, social functioning, and concentration, persistence, or pace, and only one to two episodes of decompensation (Tr. 18). The ALJ noted that the plaintiff has described in documents in the record and in her testimony a good range of regular activities of daily living, including caring for her husband, children, and grandchildren, and performing household tasks (Tr. 18). Specifically, the plaintiff indicated on a function report that she

---

[3]The plaintiff notes in her initial brief and reply brief that Dr. Lind opined that she met Listing 12.06 and asks in her conclusion that the court find that she meets the listing (doc. 11 at 11, 16; doc. 19 at 4, 7). However, the plaintiff has not developed any argument regarding the requirements of the listing nor how her impairments meet it.

takes care of grandchildren, feeds and clothes them, and transports them to and from school and to activities (Tr. 95, 188); she prepares meals for her husband and pays bills (Tr. 188); she performs household maintenance such as cleaning, dishes, laundry, and ironing (Tr. 189); and she drives, shops, sews, attends church weekly, is able to follow written and spoken directions, gets along with authority figures, and is able to walk one half to one-mile before needing to stop and rest (Tr. 189-92). Moreover, at the hearing, she reported that she gets up at 7:30 a.m., cooks, does some light work around her house, does laundry, grocery shops once a week, attends church, shops at a thrift store once or twice a week, and shops at a Family Dollar store (Tr. 37-40). She drove herself to the hearing (Tr. 35). This level of activity is consistent with the ALJ's finding of only a moderate restriction of activities of daily living due to any mental impairment (Tr. 18).

In finding that the plaintiff had moderate restriction in social functioning, the ALJ noted that despite the plaintiff's allegations of anxiety in public, since her alleged onset date of disability, she has participated in volunteer child-care activities, attended church nearly every Sunday, and shopped in public regularly (Tr. 18). The record supports this finding. Nevertheless, the ALJ accommodated the plaintiff's social anxiety by limiting her to work that did not involve public interaction and no team-type work with co-workers (Tr. 19).

In finding that the plaintiff had moderate restriction in concentration, persistence, or pace, the ALJ considered that Dr. Lind found that the plaintiff had no memory difficulties, normal psychomotor activity, adequate insight, good judgment, and logical, goal-directed speech (Tr. 18; *see* Tr. 474). The ALJ also considered that Dr. Custer, a consultative examining psychiatrist, found that the plaintiff was alert and oriented, with adequate memory, logical and goal-directed thought process, and a generally calm affect (Tr. 18; *see* Tr. 580-84). Dr. Custer observed that the plaintiff was able to recall three of three objects immediately and one out of three objects after a few minutes, and she was

21

able to remember and follow a three-step command. On a test of concentration, she was able to perform serial subtractions (Tr. 583). Just prior to her partial hospitalization at Three Rivers, Dr. Dodds found that the plaintiff was able to spell "world" forwards and backwards and that her overall concentration assessment was "good" (Tr. 351-52). Accordingly, the record supports the ALJ's finding that the plaintiff did not demonstrate a "marked" limitation in the area of concentration, persistence, or pace.

Furthermore, the record supports the ALJ's finding that the plaintiff's mental impairments did not result in "repeated episodes of decompensation, each of extended duration" (Tr. 18), which is defined in the regulations as "three episodes within one year, or an average of once every four months, each lasting for at least two weeks." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(4). Here, the only record of an episode of decompensation is the plaintiff's admission to a partial hospitalization program at Three Rivers for just over ten days in May 2011 (Tr. 319-22), which the ALJ counted as one to two episodes of decompensation.

Based upon the foregoing, substantial evidence supports the ALJ's finding that the plaintiff's mental impairments do not meet or equal Listing 12.06.[4]

Further, the ALJ also considered Dr. Lind's opinion in the RFC assessment and found the opinion to be unpersuasive (Tr. 21, 24-25). The ALJ noted that, with regard to the plaintiff's performance on the MMPI, Dr. Lind could do no more than conclude from her performance that "individuals with similar profiles have been found to experience significant impairment in occupational and interpersonal functioning" (Tr. 24; *see* Tr. 476). The ALJ noted correctly that Dr. Lind did not identify specific functional limitations for the plaintiff (as opposed to what other individuals have shown), nor did he describe limitations

---

[4]With regard to the paragraph C criteria, the ALJ found that the evidence did not establish that the plaintiff could not function independently outside the area of her own home (Tr. 19). No evidence in support of the paragraph C criteria has been presented by the plaintiff.

that would preclude all work. The ALJ further noted that Dr. Lind's GAF assessment of 49 was inconsistent with other providers in the record (Tr. 24). For example, Dr. Dodds assessed a GAF of 65 upon the plaintiff's discharge from Three Rivers (Tr. 322). NP Zaepfel, who saw the plaintiff many times during the pendency of her claim, assessed a GAF of 55 at the first session (Tr. 458), and, after monitoring and adjusting the plaintiff's medication, assessed a GAF of 60 on August 16, 2011(Tr. 463); a GAF of 65 on January 24, 2012 (Tr. 539); a GAF of 70 on February 7 and March 6, 2012 (Tr. 535, 537); a GAF of 75 on May 1, 2012 (Tr. 526); a GAF of 65 on June 11, 2012 (Tr. 525); a GAF of 70 on July 9, 2012 (Tr. 522); a GAF of 70 on October 10, 2012 (Tr. 520); a GAF of 65 on December 11, 2012 (T. 517); and a GAF of 55 on January 9, 2013 (Tr. 515). All of NP Zaepfel's GAF assessments were within the moderately limited to only transiently limited range of limitation of social or occupational functioning, contradicting Dr. Lind's assessment of a GAF of 49 (Tr. 488). The ALJ further noted that Dr. Lind acknowledged that the plaintiff had managed her symptoms adequately to allow work for 35 years but that her symptoms progressed to the point of impairment in May 2011 (doc. 24; *see* Tr. 476). However, the medical evidence of record did not demonstrate any basis for such a drastic and sudden deterioration (Tr. 24). Based upon the foregoing, the undersigned finds that the ALJ complied with applicable law in evaluating Dr. Lind's opinion, and the finding is based upon substantial evidence.

### NP Zaepfel

The ALJ also considered NP Zaepfel's medical source statement (doc. 24) from January 2013 in which she described limitations that would preclude all work activity by the plaintiff (Tr. 486-90) along with NP Zaepfel's February 2012 psychosocial assessment of the plaintiff's childhood experience, employment, and health history (Tr. 527-33). The ALJ correctly noted that, as a nurse practitioner, NP Zaepfel is not an acceptable medical source, and thus, her opinion was not entitled to controlling weight (Tr. 24). The

23

regulations define "acceptable medical sources" as licensed physicians, psychologists, optometrists, and podiatrists, and qualified speech-language pathologists. 20 C.F.R. § 404.1513(a).  "[O]nly 'acceptable medical sources' can be considered treating sources, . . . whose medical opinions may be entitled to controlling weight," and "only 'acceptable medical sources' can give . . . medical opinions."  SSR 06-03p, 2006 WL 2329939, at *2. "Other  sources" who are not "acceptable medical sources" include nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapists.  SSR 06-03p, 2006 WL 2329939, at *2.  Evidence from other sources may be used "to show the severity of [a claimant's] impairment(s) and how it affects [his or her] ability to work." 20 C.F.R. § 404.1513(d).  The ALJ "generally should explain the weight given to opinions from . . .  'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case."  SSR 06-03p, 2006 WL 2329939, at *6.  Social Security Ruling 06-03p provides that factors for consideration in evaluating such an opinion include the same factors described above for evaluation of medical opinions from acceptable medical sources, which include the length and frequency of the treatment relationship, the consistency of the opinion with other evidence, the degree to which the source presents relevant evidence to support the opinion, how well the opinion is explained, whether the source is a specialist, and any other factors tending to support or refute the opinion.  *Id.* at *4-5.

The ALJ found that the extreme functional limitations found by NP Zaepfel were not supported by her own treatment notes nor by any other treating source (Tr. 24). Specifically, the ALJ noted that NP Zaepfel's psychosocial assessment described significant daily activities by the plaintiff, including volunteer activities and singing in the choir, which were inconsistent with disabling mental limitations (Tr. 24; *see* Tr. 527-33). The ALJ also

24

noted that the mental status findings in NP Zaepfel's treatment notes were for the most part "normal or unremarkable" (Tr. 23). Further, NP Zaepfel's treatment notes showed GAF assessments that were within the moderately limited to only transiently limited range of limitation of social or occupational functioning, as set forth above, which contradicted NP Zaepfel's assessment that the plaintiff had no ability to behave in an emotionally stable matter, relate predictably in social situations, or demonstrate reliability (Tr. 24; *see* Tr. 488).

Based upon the foregoing, the undersigned finds that the ALJ complied with applicable law in evaluating NP Zaepfel's opinion, and the finding that the opinion was unpersuasive is based upon substantial evidence.

### *Dr. Zaepfel*

The ALJ also considered the opinion of Dr. Zaepfel (Tr. 21-25). In July 2013, Dr. Zaepfel stated in a report that he adopted Dr. Lind's diagnoses of PTSD and panic disorder without agoraphobia, but would change that to panic disorder with agoraphobia and add additional diagnoses of major depressive disorder, single episode, mild; OCD; and anxiety disorder, not otherwise specified. Dr. Zaepfel stated that "as a result, various psychological triggers will start her inner reaction leading to full blown panic attacks-PTSD with a host of psychophysiological responses rendering her totally disabled and non-functional" (Tr. 574-75). The ALJ noted that Dr. Zaepfel diagnosed the plaintiff with PTSD, while his wife, NP Zaepfel, from whom the plaintiff received most of her treatment as well as her medications, never diagnosed the plaintiff with PTSD (Tr. 23-24). Moreover, the ALJ noted the lack of objective findings supporting the degree of limitations asserted by the plaintiff and noted that Dr. Zaepfel's treatment records were particularly unuseful due to their illegibility and the limited nature of the treatment he provided to the plaintiff (Tr. 23; *see also* Tr. 21). Further, the ALJ noted that Dr. Zaepfel misstated the plaintiff's history somewhat by stating that the plaintiff's father shot a gun at her, when all other reports described an incident in which the plaintiff's father shot at her sister (Tr. 25; *see* Tr.574).

25

*See* 20 C.F.R. § 404.1527(c)(1)-(5) (factors for consideration in evaluating medical opinion include the examining relationship; the length of the treatment relationship and the frequency of the examinations; the nature and extent of the treatment relationship; the evidence with which the physician supports his opinion; the consistency of the opinion; and whether the physician is a specialist in the area in which he is rendering an opinion).

The undersigned finds that the ALJ properly evaluated this treating psychologist's opinion, and the finding that the opinion was unpersuasive is based upon substantial evidence.

### *Dr. Custer*

The plaintiff further argues that the ALJ erred in relying on the opinion of consultative examiner Dr. Custer, who is a psychiatrist (doc. 11 at 13-15).  Dr. Custer examined the plaintiff in September 2013 and opined that she had no limitation in the ability to understand, remember, and carry out simple instructions and a moderate limitation in complex instructions due to the fact that she may have some mild short-term memory deficits based on recalling one out of three objects after five minutes (Tr. 577). Dr. Custer noted that the plaintiff had a moderate limitation in the ability to interact appropriately with the public due to anxiety when in crowds and around strangers, but no limitation in interacting appropriately with supervisors or co-workers.  Dr. Custer observed that the plaintiff had a moderate limitation in the ability to respond appropriately to changes in a routine work setting based on her alleged difficulty adjusting to a new alarm that was installed at work (Tr. 577-84).

The ALJ provided a detailed discussion of Dr. Custer's examination of the plaintiff (Tr. 22-23) and gave Dr. Custer's opinion significant weight, finding the opinion was consistent with the medical evidence of record as a whole (Tr. 25). The ALJ noted that Dr. Custer stated that it was likely that the plaintiff's functional status was somewhat better than she professed (Tr. 22-23; *see* Tr. 583), and ultimately the ALJ concluded that the plaintiff's

subjective complaints were not fully credible (Tr. 19-24). Credibility determinations are within the providence of the ALJ. *See Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (stating that the court may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]") (citing *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir.1990)).  The ALJ adopted Dr. Custer's findings by limiting the plaintiff to unskilled work that did not require interaction with the public or team-type interaction with co-workers (Tr. 19).  As noted by the Commissioner, Dr. Custer affirmed his findings in the interrogatories propounded by the plaintiff's attorney (Tr. 239-40).

It is the role of the ALJ to resolve any conflicts in the evidence. *See Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Dr. Custer's opinion that, despite her complaints, the plaintiff can perform simple, unskilled work that does not require interaction with the public or teamwork with co-workers is supported by the record.   Here, the plaintiff has failed to demonstrate that the ALJ's reliance on Dr. Custer's opinion was not supported by substantial evidence or reached through application of an incorrect legal standard.

*RFC*

Lastly, the plaintiff argues that the ALJ erred in finding that she was capable of performing work at all exertional levels but with some non-exertional limitations caused by her mental condition.  Specifically, the plaintiff contends that the degenerative condition of her cervical and lumbar spine would at least prevent her from performing work at the medium and heavy exertional levels and her severe panic disorder would prevent her from completing any full-time work or substantial gainful activity (doc. 11 at 15-16).

As discussed above with regard to the ALJ's step two finding, the ALJ considered the plaintiff's complaints of back pain in the RFC assessment, but found that the medical record and the plaintiff's activities of daily living did not support her allegations of disabling back pain (Tr. 24).  Moreover, the State agency medical consultants found that

the plaintiff had no severe physical impairments, and the ALJ gave these opinions great weight (Tr. 25; *see* Tr. 61-62, 76-77).

Further, with regard to the plaintiff's contention that she has two to three panic attacks a day that would make her unable to work for 30 to 60 minutes each day (Tr. 45), at the administrative hearing, the plaintiff's attorney asked the vocational expert whether there would be any jobs such an individual could perform, and the vocational expert responded that there would be no jobs (Tr. 54-55). The ALJ considered this testimony, but found that the limitations described by the plaintiff's attorney were not supported by the evidence of record (Tr. 26). Specifically, the ALJ found that the plaintiff's subjective complaints were not fully credible and discussed at length her reasons for this finding (Tr. 19-24). Further, as set forth above, the ALJ gave great weight to the opinion of Dr. Custer who noted that it was unclear whether the plaintiff was exaggerating her symptoms (for instance, claiming to have two to three panic attacks every day despite psychiatric treatment), whether she had been compliant with her treatment, and whether there was some type of secondary gain that was promoting her illness behavior (Tr. 583). Dr. Custer further questioned why the plaintiff was able to work for 35 years and then suddenly develop panic attacks despite being removed from the only precipitant that she could identify, which was the buzzer at work. He concluded that it was likely that the plaintiff's functional status was somewhat better than what she professed (Tr. 583).

The plaintiff has failed to show that the RFC finding was not supported by substantial evidence or reached through application of an incorrect legal standard.

## CONCLUSION AND RECOMMENDATION

This court finds that the Commissioner's decision is based upon substantial evidence and free of legal error. Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

June 11, 2016
Greenville, South Carolina